**AMERICAN MEDICAL ASSOCIATION, et al., Appellants,**

v.

**Janet RENO, Attorney General, et al., Appellees.**

No. 94–5232.

United States Court of Appeals, District of Columbia Circuit.

Argued May 15, 1995.

Decided June 27, 1995.

Mark E. Haddad argued the cause, Washington, DC, for appellants. With him on the briefs were Carter G. Phillips, Jonathan E. Nuechterlein and Jack R. Bierig.

Irene M. Solet, Atty., U.S. Dept. of Justice, argued the cause, Washington, DC, for appellees. With her on the brief were Frank W. Hunger, Asst. Atty. Gen., Eric H. Holder, Jr., U.S. Atty., and Michael J. Singer, Asst. Director, Appellate Staff, U.S. Dept. of Justice. Vincent M. Garvey and Sylvia T. Kaser, Counsel, U.S. Dept. of Justice, entered appearances.

Before: WALD, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The American Medical Association, six other professional and trade organizations representing individuals and businesses subject to registration fees under the Controlled Substances Act, and two individuals who pay such fees (collectively, "the AMA") challenge the Drug Enforcement Agency's ("DEA" or "agency") increase of controlled substance registration fees on the grounds that the underlying rulemaking failed to provide adequate notice or explanation of the costs and scope of the diversion control program to be funded through those fees. We hold that the rulemaking was inadequate and that the rule must be remanded to the DEA for further proceedings in which the DEA provides both

an opportunity for meaningful notice and comment on, and an explanation of, the components of the diversion control program.

## I. BACKGROUND

### A. *Statutory Background*

The Controlled Substances Act identifies five categories of "controlled substances"—drugs with a potential for abuse—and establishes a registration system for doctors, pharmacists, manufacturers, importers, and exporters who handle them. Under the Act, the DEA[1] is authorized to register the handlers of controlled substances and to collect from them "reasonable fees relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances." 21 U.S.C. § 821 (Supp. V 1993).[2] Pursuant to this authority, the DEA established what has become known as the diversion control program, carried out by its Office of Diversion Control.

Near the end of fiscal year 1993, Congress made the diversion control program self-financing. The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1993, Pub.L. No. 102–395, 106 Stat. 1828 (1992) ("1993 Appropriations Act") directed the DEA to set fees "at a level that ensures the recovery of the full costs of operating the various aspects of [the diversion control] program." 21 U.S.C. § 886a(3) (Supp. V 1993). These fees are to be deposited in a separate "Diversion Control Fee Account" and refunded to the DEA "in accordance with estimates made in the budget request of the Attorney General for" each fiscal year. 21 U.S.C. § 886a(4) (Supp. V 1993).

### B. *The DEA's Rulemaking*

In order to implement the mandate of the 1993 Appropriations Act, the DEA issued a notice of proposed rulemaking indicating its intention to quadruple the fees assessed from each category of controlled substance handlers in order to fund the diversion control program. *See* 57 Fed.Reg. 60,148 (1992). The DEA did not explain in this notice how it had arrived at the total diversion control program budget to be recovered from fees. It simply asserted that "[t]he [overall] amount to be recovered is established by the Congressional appropriations process." 57 Fed.Reg. 60,148.

Several of the appellants in this case submitted a comment letter objecting to, among other things, the DEA's failure to enumerate the components of the diversion control program and to explain how it determined that a particular cost was properly attributed to that program. Letter to DEA Administrator at 1, 6 *reprinted in* Joint Appendix ("J.A.") at 55, 60. The notice, they charged, provided "no accounting of how the agency arrived at the proposed figures"; it failed to indicate the "specific activities" supported by the diversion control budget or "how the overall budget for the diversion control program was set or even who set it." *Id.* at 6, *reprinted in* J.A. at 60. The commenters further urged that certain items, if included, could not properly be charged to the handlers of controlled substances. They noted that the DEA's Office of Diversion Control carries out at least one function completely independent of the Controlled Substances Act—enforcement of the Chemical Diversion and Trafficking Act of 1988—and questioned the validity of recovering these costs through fees on controlled substance handlers. *Id.* at 4, *reprinted in* J.A. at 58.

In its final rule, the DEA again declined to identify in any detail the components of the diversion control program or its basis for attributing costs to that program. It provided only a generic and summary breakdown of the costs: "[t]he activities contained in the program which give rise to the fees consist of

---

1. Congress granted the authority to the Attorney General who, in turn, delegated it to the DEA pursuant to 21 U.S.C. § 871(a) (1988). *See* 28 C.F.R. § 0.100(b) (1994).

2. On December 17, 1993, subsequent to the rulemaking at issue here, Congress amended § 821 to require "reasonable fees relating to the registration and control of the manufacture, distribu-

tion, and dispensing of controlled substances *and to the registration and control of regulated persons and of regulated transactions.*" Domestic Chemical Diversion Control Act of 1993, § 3(a), Pub.L. No. 103–200, 107 Stat. 2333 (1993). No party has argued that this change is material to this case.

Diversion Investigators, analysts, technicians, and clerical personnel salaries and expenses; and travel, rent, utilities, supplies, equipment and services associated with these positions for the registration and control of the manufacture, distribution and dispensing of controlled substances." 58 Fed.Reg. 15,-273 (1992). In response to the charge that it had inadequately explained how it arrived at the increased fee figures, the DEA pointed to the Attorney General's budget request: "[t]he legislation specifically mandates that the amount to be recovered shall be in accordance with estimates made in the budget request of the Attorney General. Within that budget request, the budget category 'Diversion Control Program' is clearly delineated." *Id.* The DEA did not, however, provide a copy of that budget request or direct the public to a copy. Indeed, the budget request remained confidential and thus unavailable for several weeks after the final rule was promulgated.

Moreover, although it asserted that the Attorney General's "Diversion Control Program" budget request offered a "clear delineat[ion]" of the diversion control program, the DEA simultaneously concluded that that request did *not* provide the accurate or final word on costs properly attributed to the *fee-funded* diversion control program. *Id.* at 15,273. To the contrary, the DEA, on the basis of a "re-review[ ]" prompted by appellants' comments, determined that the Attorney General's "Diversion Control Program" budget request included costs for chemical control efforts that were not properly included in the *fee-funded* diversion control program. The DEA agreed with commenters that Congress did not intend controlled substance handlers to be responsible for the cost of enforcement activities under the Chemical Diversion and Trafficking Act and thus reduced the Attorney General's "Diversion Control Program" request by the cost of the chemical control efforts in order to arrive at the total amount to be collected through fees. *See id.*

The AMA brought suit in district court challenging the validity of the fee-raising rule for, *inter alia,* failure to comply with the Administrative Procedure Act's ("APA") requirements of notice and reasoned explanation. The district court concluded that the notice and explanation were adequate, *see American Medical Ass'n v. Reno,* 857 F.Supp. 80 (D.D.C.1994), and the AMA appealed. On appeal, the AMA argues that the DEA was obliged to provide (1) a breakdown of the components of the diversion control program and (2) an explanation of the grounds on which it concluded that each component is properly deemed part of the diversion control program. With respect to the first element of its requested explanation, the AMA argues that the Attorney General's budget, even if it had been available on time, would not have been adequate, because it is inconsistent with the DEA's explanation in the final rule and because it fails to explain material facts—such as, for example, whether control of LSD, a drug with no approved medical use, is included within the program.[3]

In response, and for the first time on appeal, the DEA argues that it had no obligation to identify the components of the diversion control program or its basis for attributing costs to that program in either its notice or its final explanation of the rule because the program's budget is "committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1988), and need not conform to the APA's rulemaking requirements.

## II. ANALYSIS

■ The APA requires an agency to provide notice of a proposed rule, an opportunity for comment, and a statement of the basis and purpose of the final rule adopted. 5 U.S.C. § 553(b)–(c) (1998). These requirements, which serve important purposes of agency accountability and reasoned decisionmaking, impose a significant duty on the agency. Notice of a proposed rule must include sufficient detail on its content and basis in law and evidence to allow for meaningful and informed comment: "the Adminis-

---

**3.** In describing the diversion control program, the budget request recounts efforts to control LSD. In the course of the litigation below, however, the DEA explained that this "narrative" reference to LSD was erroneous; LSD interdiction efforts are not included within the diversion control program.

trative Procedure Act requires the agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule." *Engine Mfrs. Ass'n v. EPA,* 20 F.3d 1177, 1181 (D.C.Cir.1994); *see also Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 530–31 (D.C.Cir.) ("An agency commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary."), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982); *Home Box Office, Inc. v. FCC,* 567 F.2d 9, 55 (D.C.Cir.) (proposed rule must provide sufficient information to permit informed "adversarial critique"), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977). Likewise, in adopting the final rule, the agency must "articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C.Cir. 1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

The DEA no longer disputes that its notice and explanation of the scope of the diversion control program would be inadequate under these traditional APA standards. Patently it failed to provide any data underlying the budget of the diversion control program or its basis for attributing particular costs to that program. Instead, the DEA now argues that these obligations did not apply because the scope and budget of the diversion control program is governed by the Attorney General's budget request, which, it argues, is both committed to agency discretion by law and exempted from the disclosure and explanation requirements imposed on other data underlying a proposed rule.

A. *Is the Budget of the Fee–Funded Diversion Control Program Subject to Rulemaking?*

■ We first address the DEA's argument that the scope and amount of the diversion control budget is not subject to the APA's rulemaking requirements. Although the DEA admits that the "announcement of the new fee structure … constitute[s] a 'rule'" under the APA, it argues that "the Attorney General's *budget request,* on which the 1993 Appropriations Act directs the agency to base its total fee collections, is exempt … from rulemaking requirements." DEA Brief at 26. In essence, the DEA argues that the budget request is an unalterable, pre-existing component of the rule that need not be in any way explained to the public.

Although Congress could conceivably exempt certain components of a rule from the APA's rulemaking requirements, Congress did not do so here. Indeed, we need not even determine whether a directive that fees be set in accordance with the agency's budget request would exempt the basis of the request from rulemaking requirements, because in this case Congress placed additional restraints on the total amount recoverable through fees. First, in directing that the diversion control program become self-funding through fees, Congress left intact its earlier, and consistent, requirement that fees be "reasonable," "relating to the registration and control of the manufacture, distribution, and dispensing of controlled substances." 21 U.S.C. § 821. Second, even in the section of the statute requiring the shift to fee-funding, Congress did not simply state that fees should be set at levels sufficient to fulfill the Attorney General's budget request. Instead, it directed that fees "shall be set at a level that ensures the recovery of the full costs of operating the various aspects of [the diversion control] program." 21 U.S.C. § 886a(3). It is only in the secondary step of refunding those fees from the Diversion Control Fee Account to the agency that Congress directs that refunding shall be "in accordance with estimates made in the budget request of the Attorney General." 21 U.S.C. § 886a(4). As the AMA argues, tying the refund mechanism to the agency's budget request is fully consistent with the agency's separate and independent duty in rulemaking to explain "the various aspects of [the diversion control] program." Thus, under the statute, the agency is required to subject to rulemaking its determination of the proper level at which to set its fees to ensure that they (1) "relat[e] to the registration and control of the manufacture, distribution, and dispensing of controlled substances," and (2) recover "the full

costs of operation of the various aspects of [the diversion control] program."

Indeed, the DEA's actions to date confirm this understanding of the statutory scheme. As detailed above, the DEA used the rule-making process as an occasion to *alter* the Attorney General's "Diversion Control Program" budget request to arrive at the appropriate scope of the *fee-funded* diversion control program: it removed the costs of chemical control efforts that were included in the Attorney General's budget request because it concluded that they were not properly collected through fees, and it also removed a $20,000 increase in costs for employees stationed abroad from the Attorney General's budget request on the same basis. Thus, the DEA's own conduct reveals that the Attorney General's "Diversion Control Program" budget request was subject to alteration through rulemaking in order to arrive at the appropriate financial basis for the *fee-funded* diversion control program.

### B. Committed to Agency Discretion by Law

The remainder, and bulk, of the DEA's argument centers on the principle of agency discretion in budgetary matters. The agency asserts that by linking the scope of the diversion control program to the Attorney General's budget request, Congress committed the scope of the diversion control program to the DEA's discretion, insulating it from judicial review, and—the DEA further suggests—from meaningful comment as well.

■ At the outset, we note that under the APA the ultimate availability of substantive judicial review is *distinct* from the question of whether the basic rulemaking strictures of notice and comment and reasoned explanation apply. *See Lincoln v. Vigil,* —— U.S. ——, ——, 113 S.Ct. 2024, 2033, 124 L.Ed.2d 101 (1993) (addressing the question, *"quite apart from the matter of substantive reviewability,"* of whether the agency "was required to abide by the familiar notice and comment provisions of the APA") (emphasis added). The APA's procedural requirements are enforceable apart from the reviewability of the underlying action, and, indeed, support several important functions wholly distinct from judicial review. The notice-and-com-

ment requirement helps to ensure that the rule is subjected to thoroughgoing analysis and critique by interested parties and the agency. Whether or not these parties can ultimately bring suit in court, notice-and-comment gives them an opportunity to marshall what may be persuasive arguments before the agency. *Cf. Koniag, Inc. v. Andrus,* 580 F.2d 601, 606 (D.C.Cir.) (" '[S]tanding to sue depend[s] on more restrictive criteria than standing to appear before administrative agencies. . . .' ") (quoting *National Welfare Rights Organization v. Finch,* 429 F.2d 725, 732 n. 27 (D.C.Cir.1970)), *cert. denied,* 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978). Likewise, although the "traditional rationale for [the] requirement [of a statement of findings and conclusions] has been its necessity as a basis for substantive judicial review," *Iowa State Commerce Commission v. Office of Federal Inspector,* 730 F.2d 1566, 1577 (D.C.Cir.1984), it also "promotes thought by the decision-maker and compels him to cover the relevant points and eschew irrelevances," *id.* (internal citations omitted); *see also Independent U.S. Tanker Owners Committee v. Lewis,* 690 F.2d 908, 920 (D.C.Cir.1982) ("preparation of a statement of basis and purpose should play an integral part in the decisionmaking process"), helps maintain public accountability, *see Iowa State Commerce Comm'n,* 730 F.2d at 1578, and enables a petitioner "to file a meaningful and intelligent petition for reconsideration." *National Wildlife Federation v. Costle,* 629 F.2d 118, 135 n. 49 (D.C.Cir.1980).

■ The availability of judicial review may, of course, affect the type of information and level of detail required in the agency's notice and explanation of the rule. *See Iowa State Commerce Comm'n,* 730 F.2d at 1577 (" 'The basic findings essential to the validity of a given order will vary with the statutory authority invoked and the context of the situation presented.' ") (quoting *Luckenbach S.S. Co. v. United States,* 122 F.Supp. 824, 828 (S.D.N.Y.), *aff'd,* 347 U.S. 984, 74 S.Ct. 850, 98 L.Ed. 1120 (1954)). In this case, however, the AMA does not seek explanation of the policy-based resource allocation issues that are often committed to agency discretion by law and thus insulated from judicial re-

view. Instead, it seeks explanation of substantially different budget *attribution* issues.

In the cases relied upon by the DEA to support its claim that the scope of the program is screened from comment and review, the Court has concluded that in the absence of statutory standards, certain resource allocation choices—whether or not to prosecute a case, *Heckler v. Chaney*, 470 U.S. 821, 837–38, 105 S.Ct. 1649, 1659, 84 L.Ed.2d 714 (1985), whether to pursue a statutory goal through one sort of children's health program or another, *Lincoln v. Vigil*, —— U.S. ——, ——, 113 S.Ct. 2024, 2032, 124 L.Ed.2d 101 (1993)—are committed to agency discretion by law. As the *Lincoln* court explained, these decisions require

> a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise: whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies, and, indeed, whether the agency has enough resources to fund a program at all.... [T]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.

—— U.S. at ——, 113 S.Ct. at 2032.

 In this case, by contrast, the AMA claims no right to seek judicial review of the DEA's decisions about how many resources to allocate to the diversion control program, legitimately defined, or how to distribute these resources among various diversion control projects. Nor does the AMA assert that the DEA must provide it information or a meaningful dialogue on these matters. It only seeks information relevant to the separate question of whether certain activities can properly be included within the "diversion control" program that is funded by handler fees. Indeed, from Congress' preservation of the statutory requirement that fees be "reasonable," "relating to the registration

and control of the manufacture, distribution, and dispensing of controlled substances," 21 U.S.C. § 821, it is clear that Congress intends some boundaries on the scope of the program that may be fee-funded. The drawing of these boundaries is amenable to judicial review, albeit with a sound amount of deference. *See Florida Power & Light Co. v. United States*, 846 F.2d 765, 768, 770 (D.C.Cir.1988) (reviewing an agency determination that a research program funded through fees met the statutory requirement of being "reasonably related to the regulatory service provided by the [agency]"), *cert. denied*, 490 U.S. 1045, 109 S.Ct. 1952, 104 L.Ed.2d 422 (1989). While the court cannot say, "if you are pursuing diversion control, you really should focus your energies in x, y, and z," it *can* say, when it is material to a rule, "although x and y are reasonably related to the overall diversion control program, z is just too far afield to be attributed to the diversion control program," and it can do so without intruding in any way upon the resource allocation and policy priorities that are typically left to agency discretion.

### III. CONCLUSION

We hold that the agency was required to identify the components of the fee-funded diversion control program and provide a brief explanation of why it deemed each component to be a part of that program. Because of the obvious hardship that vacating the rule would impose on the agency, the likelihood that the fees collected are not grossly out of line from what they would be if accompanied by the proper explanation, and the DEA's ability to make up through future adjustment any improper overcollection, we conclude that the rule should be remanded for further proceedings without being vacated. *See Engine Mfrs. Ass'n*, 20 F.3d at 1184 (remanding without vacating; "We are willing to assume for now that the agency's error was one of form and not substance, *i.e.*, that it will be able to provide the information necessary to explain its cost allocation decisions.").[4] Ac-

---

4. As the AMA does not challenge our longstanding practice of remanding rules without vacating them in certain circumstances, *see Checkosky v. SEC*, 23 F.3d 452, 466 (D.C.Cir.1994) (separate statement of Silberman, J.) (collecting cases), we

do not reach the question raised and left undecided in *Checkosky* as to the validity of this precedent. *See id.* at 462–66; 490–93. Because the inadequately explained rules are imposing an immediate monetary burden on fee-payers, we

cordingly, we remand the case to the district court with instructions that it remand the case to the DEA for further proceedings in accordance with our opinion.

*Remanded.*

assume that the agency will act with due haste to provide the requisite opportunity for meaningful comment and explanation.