**John E. GERBER, III and Defenders of Wildlife, Appellants.**

v.

**Gale A. NORTON, Secretary, Department of the Interior, et al., Appellees.**

**No. 01–5247.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 7, 2002.

Decided July 2, 2002.

Eric R. Glitzenstein argued the cause for appellants. With him on the briefs was Katherine A. Meyer. Jonathan R. Lovvorn entered an appearance.

Kathryn E. Kovacs, Attorney, U.S. Department of Justice, argued the cause for appellees Gale A. Norton, et al. With her on the brief was M. Alice Thurston, Attorney.

Lawrence R. Liebesman and Rafe Petersen were on the brief for appellee Winchester Creek Limited Partnership.

Before: EDWARDS, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

This case involves a challenge to a decision by the Fish and Wildlife Service to issue a permit authorizing the otherwise unlawful "taking" of the endangered Delmarva fox squirrel in connection with a proposed residential development. Appellants contend that the Service violated the Endangered Species Act (ESA) because it did not allow public comment on a key component of the developer's permit application, and because it did not make the statutorily required finding that the developer's plan reduced the impact of the taking to the maximum extent practicable. Because appellants are correct on both counts, we reverse the district court's grant of summary judgment against appellants and order the case remanded for further consideration by the Service.

I

Section 9 of the ESA makes it unlawful to "take" any endangered species. 16 U.S.C. § 1538(a)(1)(B). A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). The statute defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). The Service's regulations further define "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

Section 10 of the ESA creates an exception to the general ban on taking. Under that section, the Service may issue a permit allowing "any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Several conditions must be met prior to the grant of an incidental take permit. The applicant for the permit must submit a conservation plan, known as a "Habitat Conservation Plan" or "HCP," that describes:

(i) the impact which will likely result from such taking; (ii) what steps the applicant will take to minimize and miti-

gate such impacts ...; (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

*Id.* § 1539(a)(2)(A). The Service must publish notice of the permit application in the Federal Register, and "[i]nformation received by the [Service] as part of [the] application shall be available to the public as a matter of public record at every stage of the proceeding." *Id.* § 1539(c). The Service also must provide an "opportunity for public comment" on the application and related conservation plan. *Id.* § 1539(a)(2)(B). Finally, before issuing the permit the Service must make certain specified findings. These include findings that the taking will be incidental, that it "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild," and, most relevant here, that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking." *Id.*

Appellants John E. Gerber, III and Defenders of Wildlife (hereinafter Defenders) challenge the issuance of an incidental take permit to the Winchester Creek Limited Partnership.[1] The permit authorizes the incidental taking of Delmarva fox squirrels on a residential community development site owned by Winchester. The site, known as Home Port, is located in Queen Anne's County, Maryland, on the Eastern Shore of the Chesapeake Bay. It is "one of the last natural habitats" for the Delmarva fox squirrel, which has been listed as an endangered species since 1967. *Ger-*

*ber v. Babbitt,* 146 F.Supp.2d 1, 3 (D.D.C. 2001); *see* Final Environmental Assessment (EA) at 2 (J.A. at 649). According to the Service, residential developments may harm fox squirrels by fragmenting and degrading their habitat, disrupting their normal behavior patterns, increasing their risk of being struck by vehicles, and exposing them to attacks from pets. *See* Draft HCP at 23–28 (J.A. at 411–16).

In 1997, Winchester asked the Service whether its development would result in the taking of fox squirrels and whether it should apply for a permit. The Service responded that, as long as speed limits and leash laws were enforced in the area of the project, a taking would probably not occur and hence no permit was necessary. Defenders promptly filed a lawsuit alleging that, in determining that Winchester did not need a permit, the Service had violated the ESA, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.,* and the Administrative Procedure Act (APA), 5 U.S.C. § 706. The Service reconsidered its position and, after conducting an "in-depth review of the scientific literature," advised Winchester that the Home Port development would likely take fox squirrels, speed limits and leash laws notwithstanding. Letter from Fish and Wildlife Service (FWS) to Winchester at 1–2 (May 22, 1998) (J.A. at 289–90). In light of the Service's shift in position, Defenders agreed to dismiss their lawsuit. The dismissal was subject to a joint stipulation that the Service would publish notice of the "availability of a draft 'habitat conservation plan' ('HCP') and application for a[n] 'incidental take permit' ('ITP') for the proposed Homeport on Winchester Creek

---

**1.** Gerber is a wildlife biologist who resides near Winchester's proposed development. He has "enjoyed seeing fox squirrels [in the area] ... and will continue to enjoy viewing them as long as they are here." Gerber Aff.

¶ 4 (J.A. at 27). Defenders of Wildlife is a national conservation organization with members who similarly "enjoy observing and studying the fox squirrel." Pls.' Second Am. Compl. ¶ 4 (J.A. at 73).

residential development project," and that it would mail Defenders a "courtesy copy of the draft HCP, ITP application, and NEPA documentation." Joint Stipulation ¶ 1 (J.A. at 107–08).

On December 31, 1998, the Service issued the required Federal Register notice announcing the receipt of Winchester's application for a permit. The notice stated that persons "wishing to review the permit application, HCP, EA, and IA [Implementing Agreement] may obtain a copy by writing the Service's Chesapeake Bay Field Office." Notice of Availability and Receipt of Application, 63 Fed.Reg. 72,321, 72,321 (Dec. 31, 1998). It also stated that "[d]ocuments will be available for public inspection by written request" to that office. *Id.* The draft Environmental Assessment explained that Winchester planned to designate another "31–acre forested parcel in Queen Anne's County . . . for an off-site conservation easement to compensate in part for [the] take of [fox squirrels] at Home Port." Draft EA at 53 (J.A. at 517). In accordance with the stipulation entered into as a condition of dismissing the earlier lawsuit, the Service mailed Defenders copies of Winchester's permit application and accompanying draft HCP. That material, however, did not include a map of, or otherwise specify the location of, the proposed 31–acre mitigation site. Nor was that omission limited to the package sent to Defenders; the map was absent from all public distributions made by the agency.

Prior to publication of the Federal Register notice, Defenders had submitted a Freedom of Information Act (FOIA) request to the Service for "[a]ny and all documents that relate to or in anyway pertain to the Homeport on Winchester Creek development" or "to the conservation of the endangered Delmarva fox squirrel." FOIA Request at 1 (J.A. at 550).[2] After the notice was issued and Defenders received copies of the application and HCP, the Service responded to Defender's FOIA request. It advised that, while "the public review documents . . . were released to you on December 23, 1998," other documents were "subject to withholding." Letter from FWS to Defenders at 1 (Jan. 8, 1999) (J.A. at 552).

Thereafter, Defenders filed extensive comments on Winchester's permit application. They maintained, however, that they could not evaluate the suitability of the mitigation site as fox squirrel habitat—and hence could not evaluate the overall impact of Winchester's application—without knowing the site's location. *See* Defenders' Comments at 7 (J.A. at 764). They requested the location information, as well as a 30–day extension of the comment period to address that information. *See id.* at 7, 12 (J.A. at 764, 769).

The Service issued its final decision regarding the permit on April 11, 1999, and issued the permit itself on May 13, 1999. In approving the permit, the Service stated that the losses of live squirrels and habitat caused by the Home Port development "need to be mitigated," and that the developer planned to place "31.40 acres of wooded habitat off-site in a perpetual environmental easement" as a "conservation measure[ ] designed to mitigate" those losses. Findings and Recommendations at 13 (J.A. at 750). The Service also acknowledged that there was a "Reduced Impact Alternative" to Winchester's plan that "would reduce the likelihood of take" of fox squirrels by relocating the development's access road "away from the [squirrels'] forested edge habitat." Final EA at 5 (J.A. at 652). It noted, however, that

---

**2.** The Service's HCP Handbook states that interested persons may request permit-related documents under FOIA. *See* HCP Handbook at 6–22 to 6–23 (J.A. at 850–51).

this alternative had been "rejected by the applicant" because it would entail additional costs and would delay the process of obtaining approval from the Queen Anne's County zoning department. *Id.* And although the Service conceded that the location of the mitigation parcel was "not adequately defined" in the documentation released to Defenders, Response to Comments at 6 (J.A. at 775), and for the first time attached a map of the mitigation area to the HCP, *see* Final HCP, app. C (J.A. at 639–41), the agency denied Defenders' request for a 30–day extension of the comment period, *see* Response to Comments at 10 (J.A. at 779).

On July 22, 1999, following the Service's announcement of its approval of the Home Port permit, Defenders sent the agency a formal notification of their contention that the Service had violated the ESA by issuing the permit. Defenders again complained that the agency had "precluded the public from meaningfully commenting" on the permit application by failing to disclose "the location of the area relied on for offsite mitigation of the project's adverse effects on Delmarva Fox Squirrels." Letter from Defenders to FWS at 2 (July 22, 1999) (J.A. at 825). They noted some of the "drawbacks to the site chosen" that they "would have pointed out" had they known of the location during the comment period, restated their objection to the rejection of the Reduced Impact Alternative, and requested a reopening of the comment period. *Id.* at 3 (J.A. at 826). The Service denied Defenders' request, replying that it "cannot find a way to offer meaningful resolution of your allegations at this time."

Letter from FWS to Defenders (Aug. 26, 1999) (J.A. at 841).

On September 7, 1999, Defenders filed suit against the Service, alleging (inter alia) that the agency had violated the ESA and the APA by failing to provide the map during the comment period, and by stating Winchester's view of the practicability of the Reduced Impact Alternative rather than making its own findings. On May 15, 2001, the district court granted summary judgment in favor of the Service. The court reasoned that, even if the Service had erred by not making a map of the mitigation area available for public comment, the error was harmless. The district court also ruled that the Service had not failed to find that the Reduced Impact Alternative was impracticable. *See Gerber*, 146 F.Supp.2d at 5.[3]

II

■ Defenders appeal the district court's decision regarding both the map and the impracticability finding. We review the issues de novo, as if the agency's decision "had been appealed to this court directly." *Dr. Pepper/Seven–Up Cos. v. FTC*, 991 F.2d 859, 862 (D.C.Cir.1993). We examine those issues under the provisions of the APA,[4] and our task is to determine whether the agency's decision was made "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), or whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).

III

Defenders' first contention is that the Service violated section 10 of the ESA, 16

---

**3.** Defenders' complaint alleged other violations of the ESA and NEPA, which the district court dismissed as well. Defenders have not appealed those rulings.

**4.** *See Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C.Cir.1982) ("Since the ESA does not specify a standard of review, judicial review is governed by section 706 of the Administrative Procedure Act.").

U.S.C. § 1539, by failing to make the map of the off-site mitigation area available during the comment period. We agree with Defenders that the Service did violate section 10, and further agree that the violation was not harmless.

### A

■ Although the district court suggested that the Service was not required to make the map available because there is "no authority for the proposition that [plaintiffs] were entitled to know every detail of the HCP," 146 F.Supp.2d at 4, the Service abandons that argument on appeal. And rightly so. Section 10(c) expressly provides that "[i]nformation received by the [Service] as part of any [incidental take permit] application shall be available to the public as a matter of public record at every stage of the proceeding." 16 U.S.C. § 1539(c). While Winchester apparently did not physically attach the map to the draft HCP it submitted to the Service, Appellees' Br. at 16 n.5, there is no dispute that Winchester did submit the map, that the map was "received by" the Service, and that it was received "as part of" Winchester's application for an incidental take permit. Indeed, the Service expressly made the map part of the final HCP that was released after the comment period closed. Final HCP, app. C (J.A. at 639–41). Accordingly, as the Service now concedes, "[i]n the circumstances presented here, the map of the off-site mitigation parcel had to be made available to the public, because it was intended to be part of Winchester's application." Appellees' Br. at 17.

The Service was also required to make the map available pursuant to section 10(a) of the ESA, which instructs the agency to provide an "opportunity for public comment, with respect to a permit application and the related conservation plan." 16 U.S.C. § 1539(a)(2)(B). That opportunity for comment must be a meaningful opportunity. *See American Med. Ass'n v. Reno,* 57 F.3d 1129, 1132–33 (D.C.Cir.1995); *Engine Mfrs. Ass'n v. EPA,* 20 F.3d 1177, 1181 (D.C.Cir.1994); *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n,* 673 F.2d 525, 530–31 (D.C.Cir.1982). But as Defenders quite reasonably complained, they could not meaningfully comment on the mitigation value of the off-site parcel without knowing its location. *See* Defenders' Comments at 7 (J.A. at 764) (noting inability to assess the suitability of the site without knowing, inter alia, whether it was adjacent to other development areas). And given the Service's conclusion that the off-site mitigation area was necessary for approval of the permit,[5] there could not have been a meaningful opportunity to comment on the application without a meaningful opportunity to comment on the site. *See Engine Mfrs. Ass'n,* 20 F.3d at 1181 ("[T]he Administrative Procedure Act requires the agency to make available to the public, in a form that allows for meaningful comment, the data the agency used to develop the proposed rule."). As the agency concedes, "since the parcel had been identified by Winchester [and] examined for habitat value by the Service, ... the map should have been included in the draft HCP." Appellees' Br. at 17 n.7.

---

5. *See* Draft EA at 53 (J.A. at 517) (concluding that the acreage was *"necessary* to compensate for the loss of individual [fox squirrels] and reproductive potential" (emphasis added)); Final EA at 26 (J.A. at 702) (stating that the *"total mitigation required"* included the "31.40 acre forested parcel" (emphasis add-

ed)); Findings and Recommendations at 13 (J.A. at 750) (stating that the "impacts *need* to be mitigated" by measures that include "[p]lacing 31.40 acres of wooded habitat off-site in a perpetual environmental easement" (emphasis added)).

Finally, there is no dispute that disclosure of the map was also mandated by the stipulation that ended the earlier lawsuit between the parties. That stipulation required the Service to mail Defenders a "courtesy copy of the draft HCP, [permit] application, and NEPA documentation." Joint Stipulation ¶ 1 (J.A. at 108). Since the government concedes that "the map should have been included in the draft HCP," Appellees' Br. at 17 nn.5, 7, the stipulation required the agency to send the map to Defenders.

■ Although the Service agrees that it had to make the map publicly available during the comment period, and that it did not include a copy with the documents mailed to Defenders and other requesters, the agency nonetheless insists that it complied with section 10. It did so, the Service claims, by having the map available for public inspection at its Chesapeake Bay Field Office. According to the agency, all Defenders had to do was visit the field office; a resident official would then gladly have produced the map for their personal inspection.

There is, however, no contemporaneous evidence that the map was available for inspection at the field office. When Defenders complained in their comments that the documents they received did not disclose "the location of the mitigation site," Defenders' Comments at 7 (J.A. at 764), the Service did not immediately respond that Defenders should visit the field office. Instead, the Service "agree[d]" that the "mitigation site is not adequately defined." Response to Comments at 6 (J.A. at 775). The Service contends that the initial Federal Register notice announcing the Winchester application "indicated" that the map was available for examination at the Service's field office. Appellees' Br. at 16. There was, however, no such indication in the notice. The notice stated that docu-ments would be mailed to requesters, and that "[d]ocuments will be available for public inspection" in the Chesapeake Bay Field Office. Notice of Availability and Receipt of Application, 63 Fed.Reg. at 72,-321. It did not suggest that the documents available at the field office would be different from those available by mail, and certainly not in such an important respect. Finally, although the Service submitted a post-complaint affidavit by an Assistant Regional Endangered Species Coordinator asserting that he would have provided the map had Defenders "requested the information for the off-site mitigation area in a timely manner," Smith Decl. ¶ 6 (J.A. at 34), we will not consider that affidavit. Upon the Service's motion, the district court issued a protective order denying Defenders' request to conduct "discovery ... to probe the accuracy and veracity of th[at] extra-record assertion[ ] by defendants' declarant[ ]." Gerber Rule 56(f) Decl. ¶ 15 (J.A. at 120); see Mem. Order at 1–2 (J.A. at 105–06); Fed. Defs. Mem. in Supp. of Mot. for Protective Order at 2. It would be extraordinarily unfair to permit the Service to rely on such a post-complaint factual assertion, and at the same time allow the agency to deny its opponents the ability to test the assertion's veracity through discovery.

The District Court suggested that the Service had intentionally refused to make the map public. "[T]he omission of the map from [plaintiffs'] courtesy copy appears to have been deliberate," the court said, because "[t]he mitigation site was apparently the subject of a pending real estate transaction as to which the Service had provided Winchester Creek some assurance of confidentiality." Gerber, 146 F.Supp.2d at 4 n. 2. On June 25, 1998, Winchester advised the Service that it was ready to fax the agency its mitigation plans. "Prior to doing so," however, Win-

chester insisted that it "must have U.S. Fish & Wildlife Service['s] agreement that [the plans] will not be released under FOIA." Fax from Winchester to FWS (2:19 p.m., June 25, 1998) (J.A. at 367). The developer required this agreement, it explained, because it had not yet purchased the site and "public knowledge of the need could ... result[ ] in higher costs to Winchester." *Id.* The Service responded the same day, assuring Winchester that it concurred "that the materials you are offering to send ... qualif[y] for exemption under the Freedom of Information Act." Letter from FWS to Winchester (June 25, 1998) (J.A. at 369). Winchester promptly faxed the plans, noting the agreement that "the location of the proposed site is to be confidential." Fax from Winchester to FWS (4:06 p.m., June 25, 1998) (J.A. at 362).

We need not determine whether the Service's failure to disclose the map was in fact deliberate in order to decide the validity of Defenders' challenge. Whether or not the agency intentionally kept the map from the public, and whether or not it would have provided the map had Defenders made the trip to the field office, we conclude that the map was not publicly available within the meaning of section 10(c) of the ESA.[6] There is no dispute that, per the stipulation, the package of documents sent by the Service to Defenders should have contained the map as part of the permit application and draft HCP. *See also* HCP Handbook at 6–23 (J.A. at 851) (stating that the incidental take permit "application package ... must be provided to all affected interests who request the package or have a record of significant interest in the planning program"). De-

fenders were thus justified in concluding that, had there been a publicly available map, it would have been included in the package. Nothing in the Federal Register served "to disabuse an interested party" of that reasonable conclusion. *MCI Telecomms. Corp. v. FCC,* 57 F.3d 1136, 1141 (D.C.Cir.1995). To the contrary, in responding to Defenders' FOIA request, the Service advised Defenders—during the comment period—that while "the. public review documents ... were released to you on December 23, 1998," other documents pertaining to the Home Port development were "subject to withholding under one or more of the exceptions to FOIA," including the exemption for "confidential commercial information of the submitter." Letter from FWS to Defenders at 1 (Jan. 8, 1999) (J.A. at 552).

Under these circumstances, Defenders would not reasonably have thought that they could obtain the critically important location map simply by visiting the Service's field office. Our cases make clear that "an agency may not turn the provision of notice into a bureaucratic game of hide and seek." *MCI Telecomms. Corp.,* 57 F.3d at 1142; *see Connecticut Light & Power Co.,* 673 F.2d at 530 ("To allow an agency to play hunt the peanut with technical information, hiding or disguising the information that it employs, is to condone a practice in which the agency treats what should be a genuine interchange as mere bureaucratic sport."). Whatever the Service's intention, it plainly misled Defenders and other interested members of the public into believing that a map of the mitigation site was not in the public record. It thus violated the requirement of section

---

**6.** *Cf. MCI Telecomms. Corp. v. FCC,* 57. F.3d 1136, 1142 (D.C.Cir.1995) ("We need not speculate ... upon the question whether the Commission intentionally placed its 'notice' in the most obscure possible place, intriguing

though it is; the agency's intent is beside the point. The question is whether the notice was 'adequate to afford interested parties a reasonable opportunity to participate in the rulemaking process.' ").

10(c) that it make the complete permit application "available to the public," as well as the requirement of section 10(a) that it provide the public with a meaningful "opportunity to comment" on the application.

### B

■■■ Having concluded that the Service committed an error, we next consider whether the error was harmless, as the district court held. Under the APA, courts must take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706; *see First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C.Cir.2000). To show that error was prejudicial, a plaintiff must "indicate with 'reasonable specificity' what portions of the documents it objects to and how it might have responded if given the opportunity." *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1323–24 (D.C.Cir.1988) (quoting *Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 540–41 (D.C.Cir.1983)). Defenders have met that requirement to an extent we have rarely seen in APA cases, and have demonstrated as well as any plaintiffs could that they suffered prejudice from the agency's failure to provide an opportunity for public comment.

As we have just held, it is clear that the map of the off-site mitigation area was indispensable if Defenders were to have a meaningful opportunity to comment on Winchester's permit application. When they finally did obtain the map, Defenders specified at least three serious problems that suggested the site would not provide adequate mitigation for the taking that would occur at Home Port. In their pre-complaint letter, Defenders stated that if they had known of the site's location, they would have pointed out, inter alia, that "the site is bordered on the west by a road (Sportsm[an] Neck Road) that serves approximately 75 homes, ... thus raising questions about the survivability of any [fox squirrels] who do manage to occupy the site." Letter from Defenders to FWS at 3 (July 22, 1999) (J.A. at 826). In their post-complaint filings, Defenders further contended that the site borders another residential subdivision (Mainbrace) that is currently under development, a circumstance—like the road—that would expose the fox squirrels to domestic pets and automobile traffic, thus casting further doubt on the suitability of the mitigation site as a refuge. They also charged that the mitigation site was already protected by an open-space covenant, and hence that its designation by Winchester would not add any new protection for the fox squirrels. *See* Gerber Aff. ¶ 15 (J.A. at 30).

Although the district court held that "plaintiffs have not shown that they would have offered any additional commentary if they had been shown the map," 146 F.Supp.2d at 4, the Service does not seriously dispute that Defenders have satisfied the specification requirement. Instead, the agency contends that, even without benefit of comments from Defenders, it "knew about the potential for development adjacent to the mitigation" site and was "aware of the location of Sportsman Neck Road" when it decided to grant the permit. Appellees' Br. at 23–24. In support of this contention, the Service principally relies on two documents: a discussion of the adjacent Mainbrace subdivision submitted by Winchester and a map of the mitigation site. *Id.* (citing J.A. at 375–82). Neither is sufficient to overcome Defenders' showing of prejudice.

First, we are not at all convinced from these citations that the Service did "know" of the three problems that Defenders have identified with respect to the mitigation site. Having Winchester's view that "significant development" on the Mainbrace

parcel was "unlikely" was hardly the same as having Defenders' view, as the developer understandably downplayed the potential for development in the area of the mitigation site. *See* Letter from Winchester to FWS at 1 (July 28, 1998) (J.A. at 377). The Winchester submission did not even mention Sportsman Neck Road, so the most the Service can say about that problem is that it was "aware of the location" because it had a map on which the road was included. Needless to say, however, possessing a map that shows the physical location of a road is not the same thing as knowing the problems that the road may pose. Finally, at oral argument the Service conceded that there was no pre-complaint document of any kind that could have drawn the Service's attention to the third problem identified by Defenders: the fact that an open-space covenant already existed on the mitigation site, thus drawing into question whether placing a conservation easement on the site added anything to existing protections for fox squirrels.

Second, "knowing" is not, in any event, the same as actually considering the problems raised by Defenders. The Service cannot point to any discussion in the agency's own decisional documents that addresses any of the three problems plaintiffs highlighted. The best the agency can muster is a memorandum to the file, dated more than four months after Defenders filed their complaint, collecting documentation purportedly showing that the Mainbrace subdivision and Sportsman Neck Road "were ... considered during the development and review of the off-site mitigation package." Mem. to File at 1 (Jan. 31, 2000) (J.A. at 890); *see also* Letter from FWS to Defenders at 2 (Feb. 4, 2000) (J.A. at 924) (post-complaint letter asserting that the agency "was aware of the Mainbrace development" and "considered" impacts from existing roads during the

decisionmaking process). But the only pre-complaint documents cited in the memorandum that address those points were prepared or submitted by the developer, not by the agency, and so have the same self-interest deficiency noted above.

The Service also contends that any error it may have made by not providing a meaningful opportunity for comment prior to approval of the permit was rendered harmless by the fact that, after hearing Defenders' post-decision comments, the agency "reaffirmed its decision." Appellees' Br. at 22. The only pre-complaint evidence of such a reaffirmation cited by the Service is its August 26, 1999 response to Defenders' formal notification that the Service had violated the ESA. That document, however, does not respond to or even mention the substantive concerns raised by Defenders; it merely asserts, without elaboration, that "it is our opinion that we acted with proper process and within the law." Letter from FWS to Defenders (Aug. 26, 1999) (J.A. at 841). It is therefore insufficient to sustain the agency's decision. *See Appalachian Power Co. v. EPA,* 249 F.3d 1032, 1059 (D.C.Cir.2001) ("This Court is obligated to overturn a rulemaking as arbitrary and capricious where the [agency] has failed to respond to specific challenges that are sufficiently central to its decision." (internal quotation marks omitted)); *see also Baltimore Gas & Elec. Co. v. United States,* 817 F.2d 108, 116 (D.C.Cir.1987).

The Service is therefore left with the argument that its procedural error was harmless because, after Defenders filed their complaint and elaborated on their concerns, the agency nonetheless concluded that it would not have changed its decision had it known of those concerns at the time it issued the permit. *See* Appellees' Br. at 22; Pennington Decl. ¶¶ 8–13 (J.A. at 38–40) (post-complaint declaration

of assistant field office supervisor); Letter from FWS to Defenders at 1–2 (Feb. 4, 2000) (J.A. at 923–24) (post-complaint letter from field office supervisor). We do not generally give credence to such post hoc rationalizations, but rather "consider only the regulatory rationale actually offered by the agency during the development of the regulation." *Grand Canyon Air Tour Coalition v. FAA,* 154 F.3d 455, 469 (D.C.Cir.1998); *see Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962). That rule is particularly appropriate in a case like this, because the alternative is to create a regulatory Catch–22: If plaintiffs fail to detail the issues upon which they would have commented, they lose their challenge for failure to satisfy the "reasonable specificity" requirement of the harmless error rule; but if plaintiffs do specify what they would have said, the agency may simply thank them for their specificity and announce that it has nonetheless reached the same conclusion. Such an approach would eviscerate the ESA's notice requirements, and we therefore cannot condone it. *Cf. Sugar Cane Growers Coop. v. Veneman,* 289 F.3d 89, 96 (D.C.Cir.2002). In this case, appellants "have presented enough to show that on remand they can mount a credible challenge to the [issuance of the permit] and were thus prejudiced by the absence of an opportunity to do so before" the agency issued the permit. *Utility Solid Waste*

*Activities Group v. EPA,* 236 F.3d 749, 755 (D.C.Cir.2001). That is all that is required to defeat the Service's claim of harmless error.[7]

We conclude that the Service violated the ESA by failing to inform Defenders of the location of the mitigation site, and that the violation was not harmless. At the same time, we cannot fail to note that the Service could easily have avoided the prolonged litigation that has transpired over this issue. All it had to do was grant Defenders' reasonable request for a 30–day extension to comment on a map that the agency concedes should have been included in the draft HCP from the outset.

## IV

■ Defenders' second contention is that the issuance of the incidental take permit violated section 10 of the ESA because the Service failed to find that the developer would minimize the impacts of the taking "to the maximum extent practicable." 16 U.S.C. § 1539(a)(2)(B). It is plain on the face of the statute that it is the Service (as delegatee of the Secretary of the Interior) that must make this finding. *See id.* (providing that a permit shall issue "[i]f the Secretary finds," inter alia, that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking"). Indeed, the agency's own handbook so states. *See* HCP Handbook at 7–3 (J.A. at 852) (declaring that, while "[t]he applicant decides

---

7. The principal harmless error cases cited by the Service and the district court are not to the contrary. In *Steel Manufacturers Ass'n v. EPA,* we held that "petitioners' lack of opportunity to comment on *one* of the agency's rationales for setting" a zinc standard was harmless error "because EPA had adequate and *independent* grounds" for setting the standard. 27 F.3d 642, 649 (D.C.Cir.1994) (emphasis added). In *Chemical Manufacturers Ass'n v. EPA,* the Fifth Circuit held that EPA's failure to publish certain data was harmless

because, even without that data, the petitioner "was fully able to make" the challenge that it wanted to make to an EPA effluent limitation. 870 F.2d 177, 202, *clarified,* 885 F.2d 253 (5th Cir.1989). In the instant case, the Service does not offer a ground independent of the mitigating value of the designated site that would have justified issuance of the incidental take permit, and Defenders were not able to challenge the value of that site without knowing its location.

during the HCP development phase what measures to include in the HCP ..., the *Service*[ ] ultimately decide[s], at the conclusion of the permit application processing phase, whether the mitigation program proposed by the applicant has satisfied this statutory issuance criterion") (emphasis in original). Accordingly, both parties agree that, before issuing the permit, the Service was obliged to find independently that no practicable alternative to Winchester's development plan would minimize the taking of fox squirrels..

We cannot conclude that the Service independently made such a finding. To the contrary, the Service found, both in its draft and final Environmental Assessment, that there *was* a "Reduced Impact Alternative" that "would reduce the likelihood of take" of fox squirrels: relocating the Home Port project's access road away from the squirrels' habitat. Draft EA at 5 (J.A. at 467); Final EA at 5 (J.A. at 652). According to the Service, this alternative would have reduced the number of animals killed or injured by automobiles, "the leading cause of fox squirrel 'takes.'" *Gerber,* 146 F.Supp.2d at 3; *see* Appellees' Br. at 27. Indeed, the developer itself acknowledged that this alternative "would greatly reduce take of [fox squirrels] by providing an adequate buffer from the wood's edge to existing structures." Draft HCP at 56 (J.A. at 444). Accordingly, the Service expressly "requested a modification to the applicant[']s design plan which would provide for a relocation (or shift) of the right-of-way entrance road ... away from the ... forested edge habitat." Draft EA at 5 (J.A. at 467); Final EA at 5 (J.A. at 652).

Winchester, however, rejected the requested alternative, and the Service nonetheless issued the permit. Given the Service's finding that moving the road would reduce the taking of squirrels, the agency could not have issued the permit consistent with section 10(a) without making a finding that the Reduced Impact Alternative was impracticable. But there is no evidence in the record that the *Service* ever made such a finding. It did repeatedly observe that the *developer* had rejected the alternative. *See* Final EA at 5 (J.A. at 652) (stating that "[t]his alternative was rejected by the applicant"); Draft EA at 5 (J.A. at 467) (same). And it noted that Winchester did so out of concern that changing the design would entail additional costs and delay the process of obtaining approval from the county zoning department. *See* Final EA at 5 (J.A. at 652). But the Service was careful to state that these were the developer's views. *Id.* Indeed, the agency's decisional documents do not contain any *analysis* whatsoever as to whether implementation of the Reduced Impact Alternative would actually result in additional costs and delay, or whether the magnitude of such costs or delay would render the alternative impracticable. To the contrary, the Service declared that "no supporting economic analysis was sought or considered." Response to Comments at 6 (J.A. at 775).

When a statute requires an agency to make a finding as a prerequisite to action, it must do so. Merely "[r]eferencing a requirement is not the same as complying with that requirement." *Sugar Cane Growers Coop.,* 289 F.3d at 97. And "[s]tating that a factor was considered"—or found—"is not a substitute for considering" or finding it. *Getty v. Federal Savings and Loan Ins. Corp.,* 805 F.2d 1050, 1055 (D.C.Cir.1986); *see id.* at 1057 (holding that a "conclusory recitation" failed to satisfy a statutory requirement that the agency "consider" a specified factor). Nor may the agency delegate its responsibility to the regulated party. *See State of Idaho v. ICC,* 35 F.3d 585, 596 (D.C.Cir.1994) (holding that the ICC failed to meet its responsibilities under

NEPA by "deferr[ing] not only to the judgments of other agencies, but also to that of Union Pacific, the licensee"); *Illinois Commerce Comm'n v. ICC*, 848 F.2d 1246, 1259 (D.C.Cir.1988) (holding that the agency "may not delegate to parties and intervenors its own responsibility to independently investigate and assess the environmental impact of the proposal before it"). Because the Service did not make the independent finding required by the ESA as a prerequisite to issuance of an incidental take permit, issuance of the permit violated the statute.

## V

In the course of approving the incidental take permit for the Home Port development, the Fish and Wildlife Service violated two requirements of the ESA. It did not make available for public comment critical information received in connection with Winchester's permit application. *See* 16 U.S.C. § 1539(a)(2)(B), (c). And it did not make the statutorily mandated finding that the developer's plan would minimize the negative impact on the endangered Delmarva fox squirrel to the maximum extent practicable. *See id.* § 1539(a)(2)(B)(ii). As a consequence, the Service issued the permit "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), and acted "otherwise not in accordance with law," *id.* § 706(2)(A). We therefore reverse the district court's grant of summary judgment, and remand to the district court with instructions to remand to the agency for further proceedings. *See Sugar Cane Growers Coop.*, 289 F.3d at 98.

*So ordered.*